IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MEDICAL DIAGNOSTIC LABORATORIES, LLC<br><br>    *Plaintiff,*<br> v.<br><br>INDEPENDENCE BLUE CROSS and LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>    *Defendants.* | CIVIL ACTION<br>NO. 16-5855 |

**PAPPERT, J.**                              August 30, 2017

## MEMORANDUM

  Medical Diagnostic Laboratories is an outpatient medical laboratory specializing in tests for sexually transmitted infections. It sued Independence Blue Cross and the Laboratory Corporation of America, alleging the pair entered into an exclusive dealing agreement that violates Section 1 of the Sherman Antitrust Act. It also brings several state-law claims. Both Defendants have filed motions to dismiss the Amended Complaint. The Court grants the motions in part and denies them in part for the following reasons.

### I.

### A.

  Independence Blue Cross ("IBC") is a Blue Cross Blue Shield regional network providing health insurance for customers in five counties in Southeastern Pennsylvania, which the Amended Complaint defines as Chester, Bucks, Delaware, Montgomery and Philadelphia Counties. *See* (Am. Compl. ¶¶ 29, 57, ECF No. 41). IBC

controls 67.5% of the private health insurance market in those counties, representing over 2.5 million insureds. *See* (*Id.* ¶¶ 26, 58). Its business model is typical of the industry: IBC contracts with doctors and other healthcare providers to create a network of providers who agree to serve its insureds. Under these contracts, known as "provider agreements," IBC agrees to reimburse its "in-network" providers at a discount from their typical, open-market rate. (*Id.* ¶ 61.) Providers accept this discounted rate because being in-network assures them of a greater volume of patients. *See* (*id.* ¶ 62.)

IBC also contracts with outpatient laboratories to perform diagnostic testing for its insureds when their healthcare providers deem it necessary. *See* (*id.* ¶¶ 63–65). Under IBC's various insurance plans, its insureds are free to use out-of-network labs, though they may face higher out-of-pocket costs for doing so. (*Id.* ¶ 71.)

IBC's exclusive in-network testing laboratory is Laboratory Corporation of America Holdings ("LabCorp"). *See* (*id.* ¶ 13.) IBC touts LabCorp as its "exclusive, nationally based provider of outpatient laboratory services." (*Id.* ¶ 68.) Since becoming IBC's exclusive in-network lab, LabCorp has displaced all other in-network labs in Southeastern Pennsylvania; it now owns all in-network laboratories within 200 miles of Philadelphia. (*Id.* ¶ 70.)

Medical Diagnostic Laboratories, LLC ("MDL") specializes in "unique, patented, and patent-pending" tests to detect multiple pathogens associated with sexually transmitted infections ("STIs"). (*Id.* ¶¶ 43–44.) It uses a unique method to quickly test not only for the presence of certain STIs, but also to determine whether those STIs are antibiotic resistant. (*Id.* ¶¶ 45–56.) MDL understandably touts this service—"[t]he CDC, along with the [World Health Organization], have determined that providing

antibiotic susceptibility testing . . . is essential for many pathogens that are notorious for their ability to mutate and become resistant to antibiotic[s]." (*Id.* ¶ 51.) MDL offers its antibiotic resistance testing as a "reflex test," performing it automatically for no additional charge whenever it finds the presence of a potentially antibiotic-resistant STI. (*Id.* ¶ 52.) MDL claims that this reduces reliance on antibiotics, improves the efficiency of prescribed drugs, avoids repeat patient visits, improves patient comfort and reduces the spread of disease and the cost of treatment. (*Id.* ¶ 57.)

Although MDL is an in-network laboratory in thirty-two of the thirty-six Blue Cross Blue Shield regional networks across the country, it has not been in IBC's network at any relevant time. *See* (*id.* ¶¶ 57, 64.) Being out-of-network never used to matter to MDL: prior to July 1, 2014, Quest Diagnostics was IBC's in-network outpatient lab, (*id.* ¶ 63); during that time, MDL tested IBC insureds, submitted claims for payment to IBC, and was reimbursed by IBC for its services. (*Id.* ¶ 65.) In 2013 alone, IBC paid MDL over $1.6 million for nearly 42,000 tests performed for IBC insureds. (*Id.* ¶ 87.)

That all changed when IBC named LabCorp as its in-network lab on July 1, 2014. (*Id.* ¶¶ 67–68.) Since then, IBC and LabCorp have worked together to pressure IBC's in-network healthcare providers to refer all lab testing to LabCorp. (*Id.* ¶ 73.) Representatives from both IBC and LabCorp have contacted several in-network providers and threatened to withhold reimbursements—even for unrelated services— unless the providers stop sending lab work to MDL. (*Id.* ¶¶ 78–80.) Because of the Defendants' pressure, MDL now receives substantially fewer test referrals from IBC's in-network providers. (*Id.* ¶ 77.)

The Defendants have also made it more difficult for MDL to receive payment from those remaining IBC insureds on whom MDL performs tests. IBC denied MDL access to the "NaviNet" website, which allows both in-network and out-of-network healthcare providers and labs to view when IBC has reimbursed its insureds for their services. (*Id.* ¶¶ 82, 84). Without access to NaviNet, MDL "does not know when IBC has made payment to the insured for services provided by MDL, or in what amount." (*Id.* ¶ 85.) This makes it harder for MDL to determine when it should contact those insureds to advise them that any reimbursement for STI testing received from IBC should be paid to MDL. (*Id.* ¶ 83.) The impact on MDL's bottom line is clear: it has lost patient volume and earnings and its growth has slowed. (*Id.* ¶ 94.)

**B.**

MDL sued IBC and LabCorp on November 10, 2016. (ECF No. 1.) It alleged that the Defendants engaged in an exclusive dealing agreement that violated Section 1 of the Sherman Act. (*Id.*); 15 U.S.C. § 1. MDL also brought state-law claims for tortious interference with existing business relations, tortious interference with prospective business relations, and unfair competition. (*Id.*) Both Defendants filed motions to dismiss, (ECF Nos. 27 & 28), and after receiving MDL's responses, (ECF Nos. 32 & 33), the Court held oral argument on the motions on May 11, 2017, (ECF No. 37). At oral argument, MDL conceded that the Complaint needed to be amended in certain areas. It acknowledged that additional facts were necessary to allege concerted action between IBC and LabCorp in order to sustain an antitrust action. *See* (Hr'g Tr., at 78:1–10). It also recognized that the state-law tortious interference claims needed

amendment. *See* (*id.*, at 66:9–11). The Court accordingly granted the Defendants' motions and dismissed the Complaint without prejudice the same day. (ECF No. 38.)

MDL filed its Amended Complaint on June 1, 2017. The Amended Complaint repleads the same four claims with additional allegations. (ECF No. 41.) MDL alleges several new facts to suggest IBC and LabCorp worked in concert as required by Section 1 of the Sherman Act, *see* (Am. Compl., ¶¶ 78(a)–(m)), as well as several other facts to bolster their antitrust claim, *see* (*id.* ¶¶ 36–37).

## II.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citation omitted). While a complaint need not include detailed facts, it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

*Twombly* and *Iqbal* require the Court to take three steps to determine whether the Amended Complaint will survive the Defendants' motion to dismiss. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). First, it must "take note of the elements the plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675). Next, it must identify the allegations that are no more than legal conclusions and thus "not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, where a complaint includes well-pleaded factual allegations, the Court "should assume

5

their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.* This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Connelly*, 809 F.3d at 786–87).

This plausibility standard, however, "does not impose a heightened pleading requirement." *Id.* In other words, "courts cannot inject evidentiary issues into the plausibility determination." *Id.* The Third Circuit has also made it clear that "at least for purposes of pleading sufficiency, a complaint need not establish a prima facie case in order to survive a motion to dismiss" because a "prima facie case is an evidentiary standard, not a pleading requirement and hence is not proper measure of whether a complaint fails to state a claim." *Connelly*, 809 F.3d at 789 (internal quotations and citations omitted). Instead, a plaintiff should plead "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements." *Id.* (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008)).

### III.

In Count I of the Amended Complaint, MDL alleges that IBC and LabCorp entered into an unlawful exclusive dealing agreement. IBC and LabCorp assert that MDL lacks standing to bring an antitrust action because MDL fails to allege a market-

6

wide injury to competition and instead merely alleges that its product is superior to LabCorp's. MDL argues that a market-wide reduction in quality is a sufficient injury to competition to confer standing for the purposes of an antitrust case. While a market-wide quality reduction may constitute a sufficient injury, MDL has not alleged facts that such a reduction happened here. Having failed to do so for the second time, its claim under the Sherman Act fails, and Count I is dismissed with prejudice.

### A.

Antitrust cases involve a unique standing analysis that recognizes "a balance must be struck between encouraging private actions and deterring legitimate competitive activity through overly vigorous enforcement." *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998) (citing *Capital Imaging Assoc. v. Mohawk Valley Med. Assoc.*, 996 F.2d 537, 539 (2d Cir. 1993)). The standing inquiry in antitrust cases focuses on prudential standing,[1] which requires "a balancing test comprised of many constant and variable factors." *Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958, 964–65 (3d Cir. 1983) (citing *Bravman v. Bassett Furniture Indus.,* 552 F.2d 90, 99 (3d Cir. 1977)); *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 536–39 (1983); *City of Pittsburgh*, 147 F.3d at 264.

---

[1] While constitutional standing requires a plaintiff to show (1) that he suffered an injury in fact; (2) that the injury is "fairly traceable" to the defendant's acts; and (3) that the injury will likely be redressed by a favorable decision, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992), prudential standing "is a set of judge made rules forming an integral part of judicial self-government," *Nevyas v. Morgan*, 309 F. Supp. 2d 673, 687 (E.D. Pa. 2004) (citing *Gen. Instrument Corp. v. Nu-Tek Elecs.*, 197 F.3d 83, 87 (3d Cir. 1999)). Prudential standing requirements are meant to "limit access to the federal courts to those litigants best suited to assert a particular claim." *Id.* (quoting *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 804 (1985)). "Stated otherwise, a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit. *Id.* (citation omitted).

These factors include:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing;

(2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress;

(3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims;

(4) the existence of more direct victims of the alleged antitrust violations; and

(5) the potential for duplicative recovery or complex apportionment of damages.

*City of Pittsburgh*, 147 F.3d at 264 (quoting *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.,* 118 F.3d 178, 181 (3d Cir. 1997)). The second of these factors—whether a plaintiff has suffered an "antitrust injury"—is necessary to confer standing, but not sufficient on its own. *Barton & Pittinos*, 118 F.3d at 182. Thus if a plaintiff cannot show an antitrust injury, it lacks standing to bring an antitrust claim even where the other factors favor it. *City of Pittsburgh*, 147 F.3d at 265.

An "antitrust injury" is an injury of the type the antitrust laws are meant to prevent—that is, injury to competition, not competitors. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 398–99 (3d Cir. 2016); *see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010). An antitrust plaintiff must allege not only personal harm, but also that the defendant's conduct affected the "prices, quantity or quality of goods or services" in the relevant market. *Mathews v. Lanscaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996) (citing *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir. 1991)); *see also Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d

8

Cir. 2001) ("[T]he antitrust laws were designed to protect *market-wide* anticompetitive activities." (emphasis added) (citing *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 333 (1990))).

**B.**

MDL does not allege that the exclusive dealing agreement between IBC and LabCorp affected the prices or quantity of STI testing. It instead asserts that the agreement reduced the quality of STI testing services available to consumers in the relevant market. *See* (Am. Compl. ¶ 5). The Defendants argue MDL has not alleged sufficient facts to show a market-wide reduction in quality as a result of the alleged agreement.[2] *See* (LabCorp Mem., at 15, ECF No. 43-1); (IBC Mem., at 16, ECF No. 44-1).

Accepting that a market-wide reduction in quality, standing alone, constitutes an antitrust injury, a complaint cannot survive on conclusory allegations that the plaintiff's products are superior to those of its competitors. Nor can a plaintiff offer a bare conclusion that quality has fallen. *Cf. City of Pittsburgh*, 147 F.3d at 263 n.13 ("[W]e need not accept as true 'unsupported conclusions and unwarranted inferences.'" (quoting *Schulkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir.

---

[2] IBC also goes a step further, arguing that an impact on quality alone is insufficient to convey antitrust standing for a Section 1 violation. (IBC Mem., at 24 n.4, ECF No. 44-1.) The Third Circuit Court of Appeals, however, has stated the relevant test in the disjunctive, requiring antitrust plaintiffs to allege that an antitrust violation "affected the prices, quantity *or quality* of goods or services" across the relevant market. *See, e.g.*, *Mathews*, 87 F.3d at 641 (emphasis added). IBC points out that MDL cites no cases proceeding on reduction in quality alone. (IBC Mem., at 24–25.) IBC also points to out-of-circuit case law expressly rejecting a reduction in quality as an antitrust injury. *See* (IBC Mem., at 24 n.4, ECF No. 44-1 (citing *Collegenet, Inc. v. Common Application, Inc.*, 104 F. Supp. 3d 1137, 1149 (D. Or. 2015))). Nevertheless, the standard in this Circuit leaves open the possibility that a market-wide reduction in quality, standing alone, is a sufficient antitrust injury.

9

1997))). A complaint must allege facts to support a reduction in quality across the relevant market.

The Amended Complaint contains several allegations regarding the quality of MDL's tests. Most go to MDL's superiority to its competitors—MDL refers to its "superior STI specialty testing products," (Am. Compl. ¶¶ 105–06), and alleges LabCorp and other competitors cannot offer antibiotic susceptibility testing, (*id.* ¶ 57), rendering those tests "demonstrably less effective" than MDL's services, *see* (*id.* ¶ 75). MDL also alleges that its tests are "quick and effective," with "unusually quick turn-around times." (*Id.* ¶¶ 45–46.) It points to its automatic reflex testing, which it performs free of charge to determine whether an STI is antibiotic resistant. (*Id.* ¶ 52.) Reflex testing "is highly valuable to medical professionals as it ensures their patients are not prescribed drugs that will not actually cure particular strains of [an STI] their patients might have." (*Id.* ¶ 49.) MDL also makes the conclusory allegation that IBC and LabCorp have diminished "the quality of available laboratory services" for IBC subscribers. *See* (*id.* ¶¶ 5, 13).

These allegations may demonstrate specific advantages to using MDL's services, but they do not plausibly allege a market-wide reduction in quality. MDL contends that it offers unusually quick turnaround times—not that turnaround times for STI testing have increased. It alleges that its tests are effective—not that the effectiveness of STI testing has fallen. MDL also makes a conclusory allegation that LabCorp's tests are "demonstrably less effective than the services offered by MDL." Even if the Court could credit that assertion, it is merely a comparison between MDL and a single competitor. These allegations essentially boil down to a claim that MDL is superior to

LabCorp. Even if true, that does not translate into a market-wide reduction in the quality of products available to consumers. MDL contends it has been injured because IBC and LabCorp have "improperly impeded [its] growth as a high-quality diagnostic laboratory, resulting in lost patient volume, growth, and earnings to MDL." (*Id.* ¶ 94.) That may be an injury to MDL; it is not an injury to the market as a whole.

## C.

Even had MDL stated an antitrust injury, Count I would still fail. A plaintiff asserting an exclusive dealing claim under Section 1 of the Sherman Act must allege facts to show: (1) the relevant product market; (2) the relevant geographic market; and (3) that the alleged agreement forecloses a substantial share of the competition in the relevant product and geographic markets. *See Xtreme Caged Combat v. Cage Fury Fighting Championships*, No. 14-5159, 2015 WL 3444274, at *6 (E.D. Pa. May 29, 2015) (citing *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327–28 (1961))). Although the Amended Complaint arguably alleges a plausible product market,[3] it has not adequately alleged a relevant geographic market.

MDL's alleged geographic market consists of five counties in Southeastern Pennsylvania. (Am. Compl. ¶ 29.) It reasons that "IBC only service[s] and ha[s] market power in the private health insurance market" in those five counties, (*id.*), and thus "IBC's region of influence is limited to those five counties," (*id.* ¶ 30). The Defendants contend that this definition is defective, because a relevant geographic

---

[3] The Amended Complaint alleges a product market in relevant terms. *See* (Am. Compl. ¶¶ 36–37). MDL need not, at the motion to dismiss stage, perfectly articulate the product market. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). Nevertheless, it must allege the market in terms of the reasonable interchangeability of use and cross-elasticity of demand from the perspective of the relevant consumer. *See id.* MDL has done so here. It alleges that "the rise of the price of one [STI test] would tend to create a greater demand for other like goods in that market." (Am. Compl. ¶ 37.)

11

market must be defined in terms of where a consumer would look to purchase STI testing services. *See* (IBC Mem., at 19, ECF No. 44-1). They are correct.

The precise boundaries of a geographic market is a question of fact inappropriate for a motion to dismiss. *See, e.g.*, *Borough of Lansdale v. Phila. Elec. Co.*, 692 F.2d 307, 311 (3d Cir. 1982). But courts should not "turn this general rule into a *per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under FED. R. CIV. P. 12(b)(6)." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (addressing product-market definition). Thus while MDL need not prove that its alleged geographic market is correct at this stage, it must allege a geographic market with reference to the relevant considerations.

A geographic market must be alleged in terms of consumer choices—that is, in terms of "the area in which customers would look to purchase the product." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 922 F. Supp. 1055, 1060 (E.D. Pa. 1996), *aff'd Queen City Pizza,* 124 F.3d 430. "The mere delineation of a geographic[ ] area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market." *Synthes, Inc. v. Emerge Med., Inc.*, No. 11-1566, 2012 WL 4473228, at *7 (E.D. Pa. Sept. 28, 2012) (quoting *Tunis Bros.,* 952 F.2d at 727).

MDL does not allege a geographic market in such terms. The Amended Complaint is silent as to where a purchaser can look to purchase STI testing. *Cf. Tunis Bros.*, 952 F.2d at 726. MDL relies on IBC's area of operation and its alleged market power in that area, *see* (Am. Compl. ¶¶ 29–34), but a conclusory allegation without reference to consumer choice is insufficient, *compare Andela v. Am. Ass'n for Cancer*

*Research*, 389 F. App'x 137, 141 (3d Cir. 2010) (holding allegation of a worldwide market failed to define a relevant geographic market), *with GN Netcom, Inc. v. Plantronics, Inc.*, 967 F. Supp. 2d 1082, 1088 (D. Del. 2013) (denying motion to dismiss on geographic-market grounds because the complaint alleged facts to plausibly suggest it was impracticable for consumers to purchase its product outside of its proposed geographic market).

To the extent MDL addresses consumer choice at all, it asserts in its response that the "geographic market is indeed where the purchaser goes to obtain STI tests," and adds that "IBC is wrong [in] its attempt to define the purchaser as anyone other than the [patient]." (Pl.'s Resp., at 16, ECF No. 48.) This assertion is problematic: No such allegation is contained in the Amended Complaint, which draws the boundaries of the geographic market as the five counties in which IBC does business, rather than where patients would look to purchase STI testing. MDL thus purports to simultaneously define the geographic market in terms of patient choices and the area in which IBC exerts market power in the private insurance market. *Compare* (Am. Compl. ¶¶ 29–34), *with* (Pl.'s Resp., at 16, ECF No. 48). MDL contends that IBC's market power in those five counties limits consumer choice. In doing so, it puts the cart before the horse: it can only allege market power once it has defined a relevant market. Defining the same market with two distinct metrics (only one of which is relevant) is insufficient. MDL has failed to allege a relevant geographic market here.[4] Consequently, it has also failed to allege substantial foreclosure of any relevant market.

---

[4] MDL relies on *In re Mushroom Direct Purchaser Antitrust Litigation*, 514 F. Supp. 2d 683 (E.D. Pa. 2007), for the blanket proposition that the question of geographic market is inappropriate for the motion to dismiss stage. (ECF No. 48, at 15.) But the court in *In re Mushroom Litigation* was declining to choose between the parties' competing "adequately define[d]" geographic markets at the

13

## IV.

MDL also asserts three state law claims.[5] In Counts II and III it alleges tortious interference with existing and prospective contractual relationships, respectively. In Count IV it alleges the Defendants committed the common-law tort of unfair competition. The Defendants argue that both tortious interference claims are fatally flawed because MDL fails to identify the specific contracts with which the Defendants interfered and alleges insufficient facts to support the Defendants' specific intent to interfere with MDL's contractual relations. The Court grants the Defendants' motions as they relate to the tortious interference with existing contractual relationships claim (Count II) and denies them as they relate to the claim for tortious interference with prospective contractual relationships (Count III). The Defendants also contend that MDL's unfair competition claim should be dismissed because it relies on the same underlying behavior as their other deficient claims. Not all of those claims are deficient, however. Because the unfair competition claim alleges the same essential acts as Count III, in which MDL stated a claim for tortious interference with prospective contracts, the Defendants motions to dismiss Count IV are also denied.

### A.

MDL's claim in Count II for tortious interference with existing contractual relationships centers on two acts: IBC's refusal to reimburse its insureds for MDL's

---

motion to dismiss stage. *See id.* at 698. That is not the case here, where MDL has not alleged a geographic market with reference to consumer choices, behavior or preferences. *See* (Am. Compl. ¶¶ 29–34).

[5] The court has original jurisdiction over these claims under 28 U.S.C. § 1332 because there is complete diversity and the amount in controversy exceeds $75,000. MDL is a New Jersey company, while IBC and LabCorp are from Pennsylvania and North Carolina, respectively. (Am. Compl. ¶¶ 19–21.)

services, (Am. Compl. ¶ 115), and IBC's "denying MDL access to the NaviNet website," (*id.* ¶ 118). Tortious interference with existing or prospective contractual relations requires four elements under Pennsylvania law: (1) an existing or prospective contract between the plaintiff and a third party; (2) a purposeful act by the defendant taken with the specific intent to harm the existing relation or prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) actual legal damage because of the defendant's conduct. *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa.*, 7 A.3d 278, 288–89 (Pa. Super. Ct. 2010).

Regarding the second element—whether a defendant took a purposeful act with the specific intent to interfere with a contract—Pennsylvania courts look to the Restatement (Second) of Torts section 766.[6] *Charonneau v. Chartis Prop. Cas. Co.*, 680 F. App'x 94, 99 (3d Cir. 2017). Section 766 states that "a defendant is liable for intentional interference with contract only when the defendant induces or otherwise causes a third party not to perform a contract." *Id.* at 99 (citing RESTATEMENT (SECOND) OF TORTS § 766 (1979)). MDL alleges IBC blocked its access to the NaviNet website and refused to reimburse MDL directly tests performed on IBC insureds, making it substantially more difficult for MDL to recover payment from the IBC insureds for whom it performs testing. *See* (Am. Compl. ¶¶ 81–85). But the relevant question is whether a defendant "induc[es] or otherwise caus[es] [a] third person not to perform the contract." RESTATEMENT (SECOND) OF TORTS § 766. While the facts alleged show IBC

---

6    The Defendants also contend that MDL fails to identify specific contracts with which they have interfered. (IBC Mem., at 28–30.) MDL argues that it needs only to identify a *type* of contract at this stage in the proceedings, and that by noting its "business relationships with the consumer/insureds of IBC," it has sufficiently alleged the contracts the Defendants are alleged to have interfered with. (Pl.'s Resp., at 24–25 ECF No. 48.) The Court need not decide this issue because MDL has failed to adequately allege the second element of the test noted in *Ira G. Steffy & Son*. *See* 7 A.3d at 288–89.

has created difficulty for MDL in recovering payment from IBC patients for whom it has performed STI testing, "[i]nducement operates in the mind of the induced," *id.*, at cmt. h, and the facts do not suggest IBC has done anything to cause those third parties not to pay MDL as required under their contracts with MDL. *Cf. id.*

B.

Count III alleges tortious interference with prospective contractual relationships. MDL alleges the Defendants caused it to lose prospective business relationships by threatening to exclude healthcare providers from IBC's network unless they stopped sending lab work to MDL. (*Id.* ¶¶ 127, 131.) The Defendants again contend that MDL inadequately alleges their specific intent to harm MDL's business relationships. (IBC Mem., at 30–31; LabCorp Mem., at 30–31).

Tortious interference with prospective contracts is evaluated under the same four-part test from *Citizens Bank*, noted above. 7 A.3d at 288–89; *see also* RESTATEMENT (SECOND) OF TORTS § 766. The Amended Complaint alleges the existence of prospective contractual relations with third parties. A plaintiff in a prospective interference case must allege that there was a reasonable likelihood that the contract would have materialized absent the defendant's actions. *Devon Robotics v. Deviedma*, No. 09-3552, 2009 WL 4362822, at *7 (E.D. Pa. Nov. 30, 2009) (citing *Glenn v. Point Park Coll.*, 272 A.2d 895, 898–99 (Pa. 1971)). MDL has done so here—it alleges several providers within the IBC network informed it that despite their continuing preference for MDL's testing services, they would no longer use MDL due to the Defendants' threats. *See, e.g.*, (Am. Compl. ¶¶ 78(k), (*l*)).

16

MDL also alleges facts to suggest the Defendants committed a purposeful act with specific intent. It alleges both Defendants called several providers, demanded that they stop using MDL's services and threatened monetary penalties against those providers if they continued to refer lab work to MDL. (*Id.* ¶ 78.) While the Defendants seek to frame these acts as IBC simply encouraging its in-network providers to honor their provider agreements, that misstates the nature of MDL's allegations. MDL also alleges IBC sought to pressure its providers by withholding reimbursement even for unrelated services. (*Id.*) Those allegations permit the inference that the Defendants acted with the specific intent of interfering with MDL's future contracts.

The third and fourth elements of the test are met here as well. Read in the light most favorable to MDL, the Amended Complaint sufficiently alleges the Defendants acted without justification. *See, e.g.*, (*id.*). Finally, MDL alleges that it suffered damages because of the Defendants conduct. *See* (*id.* ¶ 122). The Defendants' motions to dismiss are denied as they relate to Count III.

## C.

MDL also brings a state-law unfair competition claim in Count IV of the Amended Complaint. This claim attacks essentially the same behavior complained of in Count III—that the Defendants have contacted healthcare providers to deter them from using MDL's services. Pennsylvania courts appear to recognize a common-law claim of unfair competition under the Restatement (Third) of Unfair Competition. *ID Security Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 688 (E.D. Pa. 2003) (collecting cases); *Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617, 668 (E.D. Pa. 1997); *cf.* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 1 (1995).

Under Section 1 of the Restatement, "the tort of unfair competition includes methods of competition which have been declared unlawful by the federal and state statutory law and state common law, as well as a residual category encompassing other business practices which, while not unlawful under current law, have been determined to be unfair." *ID Security*, 249 F. Supp. 2d at 688; RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 1, cmt. g.

"As a general matter, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 1, cmt. g. "Pennsylvania courts have recognized a cause of action for . . .unfair competition where there is evidence of, among other things, . . . tortious interference with contract." *Synthes (U.S.A.) v. Globus Med., Inc.*, No 04-1235, 2005 WL 2233441, at *8 (E.D. Pa. Sept. 14, 2005). MDL has stated a claim for tortious interference with prospective contractual relationships, and thus it would be premature to dismiss its unfair competition claim. The motions to dismiss Count IV are denied.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.