IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| MEDICAL DIAGNOSTIC LABORATORIES, LLC, | |
|---|---|
| *Plaintiff*, | CIVIL ACTION |
| v. | No. 16-5855 |
| INDEPENDENCE BLUE CROSS and LABORATORY CORPORATION OF AMERICA HOLDINGS, | |
| *Defendants*. | |

**PAPPERT, J.** October 9, 2018

**MEMORANDUM**

Medical Diagnostic Laboratories, LLC, ("MDL") provides specialized testing services for sexually transmitted infections. It sued Independence Blue Cross ("IBC") and Laboratory Corporation of America Holdings ("LabCorp"), alleging the Defendants violated antitrust laws and engaged in unfair competition by tortiously interfering with MDL's existing and prospective business relationships. Both Defendants filed Motions to Dismiss for failure to state a claim, which the Court granted in part and denied in part. Specifically, the Court dismissed the antitrust and the interference with existing business relationships claims, but allowed MDL to take discovery on the remaining counts of tortious interference with prospective contractual relations and unfair competition. IBC and LabCorp now move for Summary Judgment on those counts. After thoroughly reviewing the record and holding oral argument, the Court grants the Motions and enters judgment for the Defendants for the reasons that follow.

1

# I

## A

IBC is a Blue Cross Blue Shield regional network providing health insurance to customers in Southeastern Pennsylvania, which includes Chester, Bucks, Delaware, Montgomery and Philadelphia Counties. *See* (Johnson Decl. ¶ 8, ECF No. 87-7). IBC contracts with healthcare providers to serve its insureds. *See* (*id.* at ¶ 9). IBC's Provider Contract Manager Antoine Johnson explained that these Provider Agreements establish providers as "participating providers," commonly referred to as "in-network." *See* (*id.* at ¶ 11). Being in-network results in more patients for the providers, who in turn agree to accept discounted rates for services administered to patients with IBC insurance. *See* (*id.* at ¶ 12). "Out-of-network" providers do not have pre-negotiated rates with IBC, causing members to possibly pay more for similar services. *See* (*id.* at ¶ 13).

There are several insurance plans within IBC's benefit program, including the Health Maintenance Organization (HMO) plan and the Preferred Provider Organization (PPO) plan. *See* (*id.* at ¶ 14); *see also* ("Professional Group Provider Agreement" § 1.2, Ex. 1, ECF 89-6). Insureds must choose participating providers under the HMO plan, whereas members are free to use out-of-network providers under the PPO plan but may be subject to higher out-of-pocket costs for doing so. *See* (Johnson Decl. ¶¶ 15–16).

IBC also contracts with outpatient laboratories to perform diagnostic testing for its insureds when healthcare providers request such services. *See* (*id.* at ¶ 10). Prior to July 1, 2014, Quest Diagnostics was IBC's largest in-network outpatient laboratory.

*See* (*id.* at ¶ 26). That changed on July 1, 2014, when IBC announced LabCorp as its exclusive in-network laboratory. *See* (*id.*). Participating providers were advised of IBC's selection of LabCorp through a provider publication called "Partners in Health" and in letters mailed to providers in April 2014. *See* (Exs. 3–5 to Johnson Decl., ECF No. 87-9). In Frequently Asked Questions posted on IBC's website, IBC reminded participating providers of their contractual obligations to refer IBC members to an in-network outpatient laboratory. *See* ("Exclusive National Outpatient Laboratory Provider: Frequently Asked Questions," Ex. 2 to Johnson Decl., ECF No. 87-9).

Since IBC named LabCorp as its in-network laboratory, MDL alleges that it has received substantially fewer test referrals from IBC's in-network providers. *See* (MDL's Resp. Opp'n to IBC's Mot. Summ. J. at 10, 15, ECF No. 94). MDL specializes in "patented and patent-pending" tests to detect multiple pathogens associated with sexually transmitted infections. *See* (*id.* at 4). MDL competes directly with LabCorp. *See* (MDL's Counterstatement of Facts ¶ 3, ECF No. 94-1; IBC's Resp. to MDL's Counterstatement of Facts ¶ 3, ECF No. 118-1). In fact, since 2006, MDL has eight times unsuccessfully attempted to secure a participating clinical laboratory contract with IBC. *See* (Letter from Eli Mordechai, Chief Exec. Officer, MDL, to Anthony Coletta, Senior Vice President, IBC (Aug. 4, 2016), Ex. 5, ECF No. 89-10); *see also* (Adelson Dep. 48:22–51:16, Apr. 6, 2018, Ex. 1, ECF No. 87-3).[1]

---

[1] MDL's efforts to become an IBC in-network laboratory have continued since it lost out to LabCorp in 2014. For instance, MDL presented to Johnson and an IBC scientist on April 5, 2016. *See* (Letter from Eli Mordechai to Anthony Coletta); *see also* (Adelson Dep. 54:12–59:12; Johnson Dep. 360:10–362:25, Apr. 10, 2018, Ex. 15, ECF 87-3). On August 30, 2016, IBC told MDL that its medical directors found no clinical advantage to MDL's tests over clinical laboratories already in IBC's network. (Letter from G. David Cronan, Dir. of Provider Network Contracting, IBC, to Eli Mordechai, Chief Exec. Officer, MDL (Aug. 30, 2016), Ex. 6, ECF No. 89-11).

MDL does not have patient service centers; its business comes from specimens referred from physicians. *See* (Johnson Dep. 373:24–374:15). MDL has no written or oral contracts with physician providers, except when it accepts from hospital-based or physician-owned laboratories. *See* (Hord Dep. 281:19–287:16, Apr. 4, 2018, Ex. 13, ECF No. 87-3). When MDL acts as a referral laboratory, it sets up a "client-bill relationship." *See* (*id.* at 283:2–19). It bills the referring laboratory directly and the referring laboratory obtains payment from insurers. *See* (*id.* at 283:10–21). None of the providers in this case have or had client-bill relationships with MDL. *See* (*id.* at 287:14–17).

As early as 2014, IBC has tracked referrals of its members' specimens from participating providers to non-participating laboratories. *See* (Johnson Decl. ¶ 33). Tracking "leakage," or out-of-network referrals, is a standard practice in the healthcare industry. *See* (Krell Dep. 76:19–77:6, Apr. 24, 2018, Ex. 25, ECF No. 87-5; Kleman Dep. 25:16–26:9, Apr. 25, 2018, Ex. 21, ECF No. 87-3). When IBC identifies significant leakage, it contacts providers to remind them of their contractual obligations to refer IBC members and their specimens only to participating laboratories. *See* (Johnson Decl. ¶ 34). MDL was one of the laboratories included in IBC's leakage reports.

B

MDL filed its Complaint on November 11, 2016, alleging four counts: (1) unreasonable restraint of trade in violation of Section 1 of the Sherman Act; (2) tortious interference with existing business relations; (3) tortious interference with prospective business relations and (4) unfair competition. (ECF No. 1.) IBC and LabCorp filed Motions to Dismiss for failure to state a claim. (ECF Nos. 24 & 28.) On

May 11, 2017, the Court granted the Defendants' Motions and dismissed the Complaint without prejudice. (ECF No. 38.) MDL filed its Amended Complaint on June 1, 2017. (ECF No. 41.) The Defendants again filed Motions to Dismiss. (ECF Nos. 43 & 44.)

The Court issued its Opinion on August 30, 2017, granting the motions in part and denying them in part. (Mem. & Op. at 1, ECF No. 55.) With respect to the antitrust claim, the Court found that MDL did not allege sufficient facts to show a market-wide reduction in quality as an injury; consequently, MDL lacked standing to assert this claim. *See* (*id.* at 7–11). Even if MDL had stated an antitrust injury, the Court nonetheless held that the facts failed to establish a relevant market. *See* (*id.* at 11–12). The Court also dismissed the second count, determining that "the facts do not suggest IBC has done anything to cause those third parties not to pay MDL as required under their contracts with MDL." (*Id.* at 16.) In denying the Motions on Count III, the Court held that MDL had plausibly alleged tortious interference with prospective contractual relations, finding that it had alleged "several providers" within IBC's network that preferred MDL's services and no longer used them due to the Defendants' alleged threats. *See* (*id.* at 16–17). Given the ruling on the third count, the Court determined that it would be premature to dismiss the unfair competition claim. *See* (*id.* at 17–18).

II

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Smathers v. Mutli-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ.

P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). A mere scintilla of evidence in support of the non-moving party will not suffice; there must be evidence by which a jury could reasonably find for the non-moving party. *Id.* at 252. Summary judgment is appropriate where "the moving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowell v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

III

To state a claim for tortious interference with prospective contractual relations, the plaintiff must prove: (1) a prospective contract between the plaintiff and a third party; (2) a purposeful act by the defendant taken with the specific intent to harm the existing relation or prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) actual legal damage because of the defendant's conduct and (5) reasonable likelihood that the relationship would have occurred but for the defendant's interference. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 530 (3d Cir. 1998); *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa.*, 7 A.3d 278, 288–89 (Pa. Super. Ct. 2010); *see also* RESTATEMENT (SECOND)

6

OF TORTS § 766. A prospective contractual relationship is "something less than a contractual right, [but] something more than a mere hope." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa. 1979). It requires "adequate proof," *Gen. Sound Tel. Co. v. AT & T Commc'ns, Inc.*, 654 F. Supp. 1562, 1565 (E.D. Pa. 1987), of "an objectively reasonable probability that such a contract would arise [but for the defendant's interference]," *Applied Tech. Intern., Ltd. v. Goldstein*, No. 03-848, 2004 WL 2360388, at *6 (E.D. Pa. Oct. 20, 2004).

MDL's claim has pertained all along to its purported prospective contracts with healthcare providers. In its Amended Complaint, MDL alleged that the Defendants tortiously interfered with MDL's prospective business relationships "through, but not limited to, threats of penalties and exclusion of healthcare providers from the economic benefits of IBC's vast insurance network." (Am. Compl. ¶ 127.) MDL asserted that these "unlawful actions . . . prevent[ed] further prospective contractual relations from occurring between MDL and other healthcare providers within IBC's network." (*Id.* at ¶ 128.) At the Motion to Dismiss stage, the Court denied the Motions as they related to this count, affording MDL the opportunity to conduct discovery and identify providers with whom IBC and LabCorp had allegedly tortiously interfered.

There is no evidence in the record that MDL established prospective contractual relations with any of the providers it identified[2] and MDL's counsel conceded as much

---

2     Nor is there any evidence to support MDL's repeated refrain that IBC and/or LabCorp threatened any of these providers by telling them they would cut off reimbursements, impose penalties or financially harm the providers' practices in other ways. *See* (Am. Compl. ¶ 127). The following served as Rule 30(b)(6) designees of the providers MDL identified: Dr. Stephen Krell for the Women's Health Care Group of Pennsylvania ("WHCGPA"); Linda Kerner for East Norriton Women's Healthcare; Linda Litka for Grand View; Karin Buck Zamborsky for Dr. Helene Koch's office; Dr. Anthony Matteo for Dr. Denise Ranucci's office; Dr. Robert Kleman for Main Line HealthCare and Sharon Elenback for Dr. Goldberg's office. *See* (IBC Statement of Facts ("SOF") ¶¶ 37, 51, 65, 74–75, 92, 117, 130, ECF No. 87). Not a single provider or representative testified as

7

at the September 18, 2018, oral argument. *See* (Summ. J. Hr'g Tr. 54:10–55:18, Sept. 18, 2018) ("Q. Are you acknowledging that there is no record evidence that IBC or LabCorp interfered with prospective contractual relationships between MDL and healthcare providers? A. Yes.").[3]

Unable to prove the elements of its claim, MDL switched theories following discovery and contended in its responses to Defendants' Motions for Summary Judgment that its prospective contractual relations were not with providers but were instead with patients. (MDL's Resp. Opp'n to IBC's Mot. Summ. J. at 12–15; MDL's Mem. Opp'n to LabCorp's Mot. Summ. J. at 7, ECF No. 95.) MDL's counsel was somehow able to keep a straight face while repeating this assertion at oral argument; as he knows, however, that is not, nor has it ever been, what this case is about.

The claim was pled—twice—focused on prospective contractual relations between MDL and "healthcare providers." *See* (Compl. ¶¶ 102–03; Am. Compl. ¶¶ 127–28). On May 11, 2017, during oral argument on the Defendants' Motions to Dismiss,

---

having an existing or prospective contract with MDL or being threatened by IBC or LabCorp. *See, e.g.*, (Krell Dep. 15:2–9, 15:11–17:2) (testifying that there has never been an agreement between WHCGPA and MDL, and although WHCGPA and MDL discussed a potential client-bill agreement under which MDL would perform tests for WHCGPA's laboratory, WHCGPA decided not to enter into the agreement because it did not like some of the testing MDL performed); (Kerner Dep. 41:7–22, 51:8–16, May 1, 2018, Ex. 18, ECF No. 87-3) (testifying that East Norriton never had an obligation to refer specimens to MDL and also never received any unprofessional or threatening communications from IBC); (Litka Dep. 40:14–23, Apr. 25, 2018, Ex. 29, ECF No. 87-5) (testifying that IBC did not accuse Grand View of breaching its contract or make threats of any kind); (Zamborsky Dep. 119:1–123:20, Apr. 26, 2018, Ex. 39, ECF 87-6) (testifying that she understood the $73,000 fee as "reimburs[ing] IBC back, not [as] a penalty"); (Tiongson Dep. 38:4–6, Apr. 27, 2018, Ex. 35, ECF No. 87-6) (testifying that IBC has never threatened her).

[3] What discovery revealed—and what MDL itself knew all along—was that it could not contract with any of the seventeen providers it identified during discovery because patients are sent to off-site laboratories pursuant to non-binding referrals. *See* (Summ. J. Hr'g Tr. 77:9–78:6) (MDL's counsel conceding, "[U]nder the law, MDL and LabCorp, or any other lab, cannot have a binding contract with a provider to refer specimens or anything else. It's against the law."). Anything more than a non-binding referral relationship in this instance could constitute a violation of the Anti-Kickback Statute. *See* 42 U.S.C. § 1320a-7b(b).

8

MDL's lawyer stated, "That's why under the tortious interference with existing contract is – is the patient[.] [W]ith prospective relationships it really implicates the physician relationship." (Mot. Dismiss Hr'g Tr. 76:3–6, May 11, 2017.) In ruling on the Defendants' Motions to Dismiss, the Court understood—and was not corrected by MDL's counsel—that the prospective contractual relations involved healthcare providers: "MDL alleges the Defendants caused it to lose prospective business relationships by threatening to exclude healthcare providers from IBC's network unless they stopped sending lab work to MDL." (Mem. & Op. at 16.) When asked by IBC and LabCorp to disclose "the identity of providers with whom they are aware Defendants allegedly interfered . . ." (Rule 26(f) Joint Status Report at 3, ECF No. 63), MDL identified seventeen providers. Consistent with MDL's pleadings, MDL's Rule 30(b)(6) representatives testified that MDL's customers were not patients but providers. *See, e.g.*, (Hord Dep. 284:11–21, Apr. 4, 2018, Ex. 3, ECF No. 118-4) ("Q. And the decision as to whether to use one lab versus another . . . you view to be that of the provider or the patient? A. The provider . . . it is the provider's decision to elect what testing is most appropriate for their patient, yes.").

MDL is not permitted, after discovery has concluded, to change its theory solely because the record evidence defeats its true claim.[4] *See Philips v. Se. Pa. Trans. Auth.*, No. 16-0986, 2018 WL 827440, at *4 (E.D. Pa. Feb. 12, 2018) (holding "plaintiff cannot introduce new legal theories or claims through an opposition to a motion for summary judgment"); *see also Bell v. City of Phila.*, 275 Fed. App'x 157, 160 (3d Cir. 2008) (non-precedential) ("A plaintiff 'may not amend his complaint through arguments in his brief

---

4   MDL never sought at any time to amend its complaint to pursue this new theory.

9

in opposition to a motion for summary judgment.'") (quoting *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996)).

The Court need not determine whether the record presents any issues of fact for the jury to decide with respect to the second, third and fourth elements. MDL's claim fails because, as MDL was forced to admit based on the record, there is no evidence of a contractual relationship—existing, prospective or otherwise—between MDL and any of the providers it identified in the case.

IV

Pennsylvania courts recognize a common law claim of unfair competition under the Restatement (Third) of Unfair Competition. *ID Security Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 688 (E.D. Pa. 2003); *Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617, 668 (E.D. Pa. 1997); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 1 (1995). Under the Restatement,

> One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless . . . the harm results from . . . other acts or practices of the actor determined to be actionable as an unfair method of competition.

*Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 526 (E.D. Pa. 2008). A cause of action for unfair competition can be alleged where "there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information." *Synthes (U.S.A.) v. Globus Med., Inc.*, No. 04-1235, 2005 WL 2233441, at *14 (E.D. Pa. Sept. 14, 2005).

Unfair competition "requires the parties be competitors, *i.e.* supplying similar goods or services." *Brandywine Vill. Assocs. v. Carlino E. Brandywine, L.P.*, No. 16-

10

5209, 2018 WL 1470124, at *6 (E.D. Pa. Mar. 26, 2018). As an initial matter, IBC is not a competitor of MDL's, something MDL's counsel also admitted. *See* (Summ. J. Hr'g Tr. 109:18–21). Since there is no evidence in the record from which a jury could conclude that LabCorp tortiously interfered with any prospective contractual relationship between MDL and healthcare providers, an unfair competition claim premised on the same conduct that underlies the tortious interference claim fails as well.

As it did when discovery vitiated its tortious interference claim, MDL belatedly proffers a new theory in support of the unfair competition allegations. MDL now argues that its unfair competition claim is based not on any tortious interference with prospective contracts, but rather on misrepresentations LabCorp purportedly made regarding IBC's Provider Agreements and benefit program. *See* (MDL's Mem. Opp'n to LabCorp's Mot. Summ. J. at 2–3, 13–16).[5]

Again, MDL never alleged that either Defendant made any misrepresentations until the summary judgment stage. In its Amended Complaint, MDL alleged that "as a result of the aforementioned actions of the Defendants, MDL has been injured by the loss of a substantial portion of its existing business relations and has suffered the loss of a substantial portion of its prospective business relations." (Am. Compl. ¶ 137.) Nowhere in its Amended Complaint did MDL mention any alleged misrepresentation by LabCorp. *See* (Am. Compl. ¶¶ 132–137). In LabCorp's Motion to Dismiss, LabCorp reasonably understood MDL's unfair competition claim as related to its antitrust and

---

[5] MDL also alleges that LabCorp made misrepresentations about MDL's OneSwab test as not being FDA-approved. (Summ. J. Hr'g Tr. 110:18–111:1; MDL's Counterstatement of Facts ¶ 55.) There is no evidence in the record to support this allegation. *See* (Ritaldato Dep. 16:14–17:7, Apr. 23, 2018, Ex. 27, ECF No. 89-32) (testifying that she did not recall a conversation with LabCorp during which LabCorp told her office that the OneSwab was not FDA approved).

tortious interference claims, arguing that "MDL does not allege any 'unfair' conduct beyond that underlying its antitrust and tortious interference claims. Because those other claims fail for the reasons stated above, MDL's entirely derivative unfair competition claim fails as well." (LabCorp's Mot. Dismiss at 25, ECF No. 43.) MDL did not address its unfair competition claim at all in its response to LabCorp's Motion to Dismiss. In its Opinion on Defendants' Motions to Dismiss, the Court noted that the unfair competition claim "attacks essentially the same behavior complained of in Count III—that the Defendants have contacted healthcare providers to deter them from using MDL's services." (Mem. & Op. at 17.) Thereafter, MDL made no argument with respect to misrepresentation until it responded to LabCorp's Motion for Summary Judgment, contending that LabCorp "worked alongside IBC to misrepresent to the providers their contractual obligations to IBC, as well as the repercussions facing them if they did not uphold these alleged obligations." (MDL's Mem. Opp'n to LabCorp's Mot. Summ. J. at 15–16.)

As with its tortious interference claim, MDL cannot change its strategy and assert new legal theories or claims in an effort to stave off summary judgment. *See Philips*, 2018 WL 827440, at *4; *see also Bell*, 275 Fed. App'x at 160. In any event, the newly concocted misrepresentation angle fails on this record as well. Pennsylvania recognizes several causes of action for misrepresentation. *See Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999). Likely because it was making it up as it went along, MDL offers few specifics on the nature of the misrepresentations LabCorp allegedly made. MDL

appears to contend that LabCorp's conduct was knowing and intentional, and the Court will thus assume LabCorp's purported misrepresentations were fraudulent.[6]

To prevail on a fraudulent misrepresentation claim under Pennsylvania law, a plaintiff must prove: (1) a misrepresentation; (2) fraudulent utterance thereof; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation and (5) damage to the recipient as the proximate result." *Petruska v. Gannon Univ.*, 462 F.3d 294, 310 (3d Cir. 2006) (citing *Martin v. Lancaster Battery Co.,* 606 A.2d 444, 448 (Pa. 1992)).

MDL apparently bases its misrepresentation argument on language in the "Participating Providers" provision of section 2.10 of IBC's Provider Agreement:

> Except in an Emergency, as otherwise described in the applicable Benefit Program Requirements, or as otherwise required by law, Group Provider shall refer Members only to Participating Providers for Covered Services, including but not limited to ancillary services such as laboratory and radiology. If a Participating Provider is not available, Group Provider shall obtain Preapproval before referring a Member to a non-Participating Provider.

("Professional Group Provider Agreement" § 2.10.)[7] MDL reads this section as generally requiring participating providers to refer an IBC insured to an in-network laboratory. *See* (MDL's Resp. Opp'n to IBC's Mot. Summ. J. at 4–5). However, MDL argues that the three exceptions listed in section 2.10—"in an Emergency, as otherwise described in the applicable Benefit Program Requirements, or as otherwise required by

---

[6]  LabCorp's counsel made the same assumption at oral argument. *See* (Summ. J. Hr'g Tr. 110:3–12.)

[7]  In most Provider Agreements, this provision appears in Section 2.9 or 2.10. (Email from Antoine Johnson, IBC, to Michael Herbert, IBC, and David Miller, IBC (Jan. 1, 2016, 4:22 PM EST), Ex. 22, ECF No. 105-7.)

13

law"—allow participating providers to refer an insured to an out-of-network laboratory. *See* (*id.*).

Specifically, MDL focuses on the "Benefit Program" exception. IBC's "Benefit Program" is defined as the insured's insurance plan, *e.g.*, the HMO plan and the PPO plan. *See* ("Professional Group Provider Agreement" § 1.2). Under MDL's interpretation of the contract, the insured's insurance plan determines whether or not a provider is required to refer in-network. *See* (MDL's Resp. Opp'n to IBC's Mot. Summ. J. at 18–20). For example, MDL argues that if an insured has the HMO plan, the provider is required to refer the insured to an in-network laboratory because, under the terms of the HMO plan, insureds must choose participating providers. But if an insured has the PPO plan, the provider is not required to refer the insured to an in-network laboratory because, under the terms of the PPO plan, patients are permitted to go out-of-network but may pay higher costs for doing so. *See* (*id.* at 19). When IBC and LabCorp were minimizing leakage and reminding providers of their contractual obligations, MDL contends that LabCorp misrepresented the terms of the Provider Agreement by not specifying when providers were required to refer in-network (*i.e.*, for HMO insureds) and when they were not (*i.e.*, for PPO insureds). This argument is nonsensical, purportedly based on an obligation LabCorp didn't have and, most importantly, renders meaningless the primary point of the Agreements—to keep as many services as possible "in the family" by referring IBC insureds to IBC's in-network laboratories.

MDL nonetheless cites to multiple instances which it believes supports its evolving interpretation of the contract. *See, e.g.*, (Email from Antoine Johnson, IBC, to

Michael Herbert, IBC, and David Miller, IBC) ("Talking points" included: "We wanted to remind you that contractually you are obligated to refer members to a participating provider/lab only, regardless of their benefit product. For example, although PPO members have OON benefits, you are required to still refer only to a participating provider. The member can then decide if they want to use a provider who is nonpar."); *see also* (MDL's Counterstatement of Facts ¶¶ 30–38). At oral argument, MDL referenced the deposition testimony of Johnson and Sharon Elenback. First of all, Johnson works for IBC, which MDL's counsel acknowledged is not a competitor of MDL. *See* (Summ. J. Hr'g Tr. 109:18–21). Second, Elenback, who served as the Rule 30(b)(6) designee for Dr. Goldberg's office, testified that LabCorp representatives never communicated anything to Dr. Goldberg's practice about its obligations under the Provider Agreement beyond the contract language or IBC's publications. *See* (Elenback Dep. 66:18–73:6, Apr. 23, 2018, Ex. 8, ECF No. 97-3).

LabCorp correctly points out that there is no inconsistency between IBC's benefit program and its Provider Agreement. *See* (LabCorp's Mem. Supp. Summ. J. at 12–13, ECF No. 89-1). By its very terms, the benefit program allows PPO *members* to choose non-participating laboratories, but IBC's Provider Agreement requires participating *providers* to refer patient specimens to participating laboratories. *See* (*id.*) (emphasis in original); *see also* (Johnson Decl. ¶¶ 22–23; Johnson Dep. 231:9–232:14). While patients maintain the choice to go out-of-network according to their insurance plans, the Provider Agreements, without exception, require providers to refer in-network.

Courts have the responsibility to determine as a matter of law whether contract terms are clear or ambiguous. *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69,

15

76 (3d Cir. 2011) (citing *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1010 (3d Cir. 1980)). "When the words are clear and unambiguous," the intent of the parties must be determined from "the express language of the agreement." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (citing *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)). "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." *Id.* (citing *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993)); *see Tamarind Resort Assocs. v. Gov't of the V.I.*, 138 F.3d 107, 110–11 (3d Cir. 1998) ("We have consistently embraced the basic common law principle that a contract is unambiguous if it is reasonably capable of only one construction."); *Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.,* 247 F.3d 79, 93 (3d Cir.2001) ("[A] contract will be found ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning." (quoting *Duquesne Light Co.*, 66 F.3d 604, 614 (3d Cir. 1995) (internal quotation marks omitted)).

    IBC's Provider Agreement is clear and unambiguous. IBC chose LabCorp as its exclusive in-network provider in 2014. IBC's Provider Agreement imposes in-network referral requirements for the very purpose of advancing IBC's agreement with LabCorp. There is no inconsistency between allowing IBC insureds to choose a non-participating provider (albeit with possibly higher costs, depending on the insured's plan), while at the same time requiring providers who have contracted with IBC to refer members to

other participating providers.  There is no other way to reasonably interpret the IBC contracts and thus nothing for a jury to ponder.

     An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*

GERALD J. PAPPERT, J.